**Juliane Wilkie GILLETTE, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. A4–03–37.**

United States District Court, D. North Dakota, Northwestern Division.

Nov. 4, 2003.

Juliane Wilkie Gillette, pro se, Minot, ND, for plaintiff.

Jennifer Klemetsrud Puhl, U.S. Attorney's Office, Fargo, ND, for defendant.

### MEMORANDUM AND ORDER

HOVLAND, Chief Judge.

The plaintiff, Juliane Wilkie Gillette, seeks judicial review of the Social Security Commissioner's denial of her application for disability insurance benefits (DIB) and Supplemental Security Income (SSI). For the reasons set forth below, the Defendant's Motion for Summary Judgment is denied and the Plaintiff's Motion for Summary Judgment is granted.

## I. PROCEDURAL HISTORY

The plaintiff, Juliane Wilkie Gillette (Gillette), protectively applied for DIB and SSI on May 14, 2001, alleging that she had been disabled since January 5, 1997. Gillette's application for benefits was denied initially and again upon reconsideration. She subsequently requested a de novo hearing before an administrative law judge (ALJ). On August 6, 2002, a hearing before an ALJ was held in Minot, North Dakota. The ALJ issued a decision on September 23, 2002, wherein he concluded that Gillette was not disabled. On January 31, 2003, the Appeals Council denied

Gillette's request for review and the ALJ's decision became the final decision of the Commissioner. Gillette then filed a complaint with this Court on April 1, 2003, seeking judicial review of the Commissioner's decision.

## II. BACKGROUND

Juliane Gillette was born February 4, 1952, and was 50 years old at the time of the administrative hearing before the ALJ. She is a college graduate with a BA in political science. (Tr. 33). She last worked as a part-time high school career counselor. (Tr. 40). She alleges an inability to work due to her having systemic lupus erythematosus.[1] (Tr. 125). Gillette was first diagnosed with lupus in March of 1993. (Tr. 183–185). Her earnings history shows a steady work history through the end of 1996. (Tr. 123).

At the hearing before the ALJ, Gillette complained that her lupus caused her fatigue, a weakened immune system, nausea, diarrhea, bruising, swelling, weight gain and skin rashes. (Tr. 36, 40, 54, 63). She takes Prednisone[2] and Plaquenil[3] to treat the lupus and help prevent flare-ups. (Tr. 34, 39). Her typical day involves reading, watching TV, doing some light housework, preparing a meal or two and an afternoon nap. (Tr. 45–53). Twice a week Gillette has bad days when she is not able to function. (Tr. 66). She stopped working when the family moved from Iowa to North Dakota where her husband had found a new job. (Tr. 42–43).

At the hearing before the ALJ, a vocational expert testified that given the level of difficulties Gillette reported she would not be capable of doing her past relevant work. (Tr. 72). This was due primarily to the fatigue, the need to rest each afternoon, and the two days a week she reported being incapacitated. (Tr. 72). The vocational expert further testified that given the limitations set out in the functional capacity assessment, Gillette would be able to perform her past relevant work. (Tr. 72).

Between June of 1997 and May of 2001, Gillette was treated by Dr. James H. Lampman at the St. Alexius Medical Center in Bismarck. Dr. Lampman's comments in June of 1997 were that she was "doing quite well with her symptoms," which were fatigue, diffuse hand joint weakness, tingling feelings, headaches, fevers, weight increase, dermatitis, dry eyes, Reynaud's phenomenon and photosensitivity. (Tr. 236–237). He also added that "most of these symptoms are very quiescent now on her Plaquenil and Prednisone program." (Tr. 237). Dr. Lampman saw Gillette again in September of 1997 at which time he concluded that she had "subtle smoldering lupus, possibly with low grade rash related to photic exposure." (Tr. 234).

Gillette had a flare-up of her lupus in April of 1998 and was hospitalized for several days. (Tr. 207). The symptoms of the flare-up were swelling of the hands, feet and joints, fever, rash, chills, nausea, vomiting and dehydration. (Tr. 218). The flare-up responded well to hydration and increased steroid dosage. (Tr. 232). The likely cause of the flare-up was a reaction to an antibiotic. (Tr. 209, 230). Dr. Lampman saw her in July of 1998 for a followup to her hospitalization and con-

---

1. A chronic inflammatory connective tissue disorder of unknown cause that can involve joints, kidneys, serous (pertaining to the clear portion of any body fluid, including blood) surfaces, and vessel walls. *The Merck Manual*, 426 (17th ed.1999).

2. An anti-inflammatory corticosteroid. *Dorland's Illustrated Medical Dictionary*, 1349 (27th ed.1988).

3. An antimalarial drug also used to treat lupus and rheumatoid arthritis. *Physicians Desk Reference*, 3003 (57th ed.2003).

cluded she had "smoldering lupus configuration requiring low dose Prednisone." (Tr. 230). He noted she had a related rash on her forearms and left hand but no swollen joints, edema or adenopathy. (Tr. 230). Plaquenil was prescribed again. (Tr. 231).

Another evaluation was made by Dr. Lampman on May 11, 2001. (Tr. 270). At that time he found Gillette had "fatigue and discouragement relative to future work and does not seem to have the endurance to get back in the regular workplace." (Tr. 270). Dermatitis and muscle aches were also noted. (Tr. 270). Gillette did not sleep well and was frequently fatigued. (Tr. 271). A minor rash was noted on her face and arms. (Tr. 271). In his conclusion, Dr. Lampman noted "there are functional and psychological stresses that are impairing her employment in addition to the physical items" and "she does have a number of features that confirm her impairments and especially lack of endurance." (Tr. 271–72).

Gillette has also been treated for her lupus by Dr. Biron Baker of the Minni-Toho Health Center in New Town. He provided two letters regarding Gillette's condition. In the first letter dated September 21, 2001, Dr. Baker stated that Gillette suffered from chronic fatigue, myalgia, dysthymia and lacked endurance. (Tr. 287). In the second letter dated July 19, 2002, Dr. Baker stated Gillette's lupus had waxing and waning symptomology, she lacked the stamina necessary to work, and she had great difficulty with endurance both physiologically and emotionally. (Tr. 455). Her ability to function had declined with each exacerbation of her smoldering lupus. (Tr. 456). Her condition worsened from the spring of 2000 to the fall of 2001. (Tr. 456). In a medical opinion on Gillette's ability to work signed July 18, 2002, Dr. Baker concluded that Gillette was un-

able to perform work related activities on a regular basis. (Tr. 454).

## III. ALJ'S DECISION

The ALJ reviewed Gillette's claim in accordance with the five-step, sequential framework:[4] (1) whether the claimant is presently engaged in a substantial gainful activity, (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities, (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations, (4) whether the claimant has the residual functional capacity to perform his or her past relevant work, and (5) if the claimant cannot perform the past work, whether the Commissioner can prove that there are other jobs in the national economy that the claimant can perform. (Tr. 14–19). In order to qualify for benefits, a claimant must be unable to engage in substantial gainful activity for a minimum of twelve consecutive months.

The ALJ concluded that Gillette had not engaged in substantial gainful activities since January 5, 1997, the alleged onset date of disability. (Tr. 16). The ALJ then moved on to the second and third steps of his analysis wherein he determined that Gillette had a severe impairment, but that it was not severe enough to meet or equal the requirements of an impairment in the listing of impairments. (Tr. 20). Moving to the fourth step of his analysis, the ALJ undertook a review of Gillette's residual functional capacity. After assessing her symptoms and subjective complaints, the ALJ concluded that she was still capable of performing her past relevant work. (Tr. 23).

---

**4.** This framework is set forth in 20 C.F.R. § 404.1520. *See* 20 C.F.R. § 416.920.

The ALJ then went on to address and discount the opinions of Gillette's treating physicians, Drs. Lampman and Baker, as being unsupported by objective medical evidence in the record. (Tr. 19, 21). The ALJ also discounted Gillette's description of her limitations as inconsistent with the level of activity reported early on in the claims process. (Tr. 17). The ALJ concluded that Gillette was not disabled.

## IV. STANDARD OF REVIEW

The Court plays a limited role when reviewing the Commissioner's decisions. *Wiseman v. Sullivan*, 905 F.2d 1153, 1155 (8th Cir.1990). The Court does not conduct a de novo review. *Keller v. Shalala*, 26 F.3d 856, 858 (8th Cir.1994). Rather, a district court's role is to review the record as a whole and to determine whether the decision is supported by substantial evidence. Upon review of the pleadings and transcript of the record, the Court can affirm, modify, or reverse the decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). To affirm the Commissioner's decision, the Court must find that it is supported by substantial evidence appearing in the record as a whole. *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992). The review of the record is more than a search for evidence supporting the Commissioner's decision. The Court must also take into account matters that detract from the ALJ's findings and apply a balancing test to weigh evidence which is contradictory. *Kirby v. Sullivan*, 923 F.2d 1323, 1326 (8th Cir.1991); *Sobania v. Secretary of Health & Human Services*, 879 F.2d 441, 444 (8th Cir.1989).

When conducting its review, the Court employs a "scrutinizing analysis" that balances the supporting and contradictory evidence on the record. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987). As noted, this requires more than a search for evidence that supports the Commissioner's decision. The Court must review the entire record and weigh all evidence that fairly detracts from the Commissioner's findings. *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir.1989).

In determining whether there is substantial evidence to support the Commissioner's decision, the Court must consider:

1) the credibility findings made by the ALJ;

2) the plaintiff's vocational factors;

3) medical evidence from treating and consulting physicians;

4) the plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;

5) any corroboration by third parties of the plaintiff's impairments; and

6) the testimony of vocational experts that is based upon a proper hypothetical questions setting forth the plaintiff's impairment.

*Baker v. Secretary of Health and Human Services*, 955 F.2d 552, 555 (8th Cir.1992).

The substantial evidence standard "allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994). In other words, while the Court may weigh evidence differently, it cannot reverse a Commissioner's decision if there is sufficient evidence to support either outcome.

## V. LEGAL DISCUSSION

The first three steps in the familiar five-step sequential analysis are not at issue.

It is the ALJ's conclusions regarding step four, namely whether Gillette can perform her past relevant work, that is being contested. Gillette contends that the ALJ improperly disregarded the opinions of her treating physicians while accepting the opinions of non-examining agency physicians. Gillette also asserts that the ALJ erroneously discounted her testimony. There is little question that if Gillette's testimony is believed, and the opinions of her treating physicians are given controlling weight, Gillette would be found disabled within the meaning of the Act.

## A. TREATING PHYSICIANS' OPINIONS

■ It is well-established that a treating physician's opinion should be accorded special deference under the Social Security regulations. *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir.2000). A treating physician's opinion should be granted "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2). The Eighth Circuit Court of Appeals has held that a treating physician's opinion is generally entitled to great weight. *Rankin v. Apfel*, 195 F.3d 427, 430 (8th Cir.1999). However, the record must be evaluated as a whole. Whether an ALJ grants a treating physician's opinions substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluations. *See* 20 C.F.R. § 404.1527(d)(2). The language in Social Security Ruling 96–2p is also insightful and provides as follows:

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent

with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR § 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96–2p, 1996 WL 374188, at 4 (Social Security Administration, July 2, 1996).

■ In this case, Dr. Baker's opinion is set forth in two letters in which he concludes that Gillette lacks the endurance or stamina for full-time employment. (Tr. 287, 455). Dr. Baker's opinion is supported by the notes of Dr. Lampman. (Tr. 230–38, 270–72).

Dr. Lampman concluded that Gillette was especially impaired by her lack of endurance. (Tr. 272). Both doctors agreed in their assessments, thereby lending significant credence to their findings which are based upon having treated Gillette for several years as opposed to the conclusions of the agency physicians who never examined Gillette. The medical record reveals a patient with the chronic and progressive disorder of lupus whose symptoms have followed a declining pattern of peaks and valleys. The record and the opinions of Drs. Lampman and Baker are not contradictory and are entitled to controlling weight.

The May 11, 2001, evaluation of Gillette by Dr. Lampman is particularly telling. (Tr. 270–272), as is the failure of the ALJ to note the adverse findings from the May 11, 2001, examination in the decision. (Tr. 18–19). Specifically, the ALJ failed to note several references to fatigue, references to impaired employability, a refer-

ence to several hospitalizations, numerous pulmonary infections, a rash and muscle aches. (Tr. 270–272). The ALJ's conclusion that Gillette's condition consists of "limited expression lupus" has no support in the record. Lupus is a chronic, remitting, relapsing disorder of the connective tissues. *Bowman v. Barnhart*, 310 F.3d 1080, 1084 (8th Cir.2002). It is an inflammatory condition that causes pain and swelling that can continually flare-up, subside, and then flare-up again. *Id.*

The ALJ discounted the opinion of Dr. Baker while according great weight to the non-examining physicians, "supported by the medical records of Dr. Lampman." (Tr. 21). The opinions of the non-examining physicians consist of a few conclusory paragraphs that are of little benefit in evaluating the totality of the case. (Tr. 282, 434). The two non-examining physicians discounted many of Dr. Lampman's conclusions and determined that his opinion, that Gillette's employability was impaired, was not entitled to controlling weight. (Tr. 282, 434). The conclusions of the two non-examining physicians and the conclusion of Dr. Lampman are inapposite.

In addition, there is nothing in the record to suggest that Dr. Baker fabricated his conclusions. The ALJ's speculation that Dr. Baker's opinion was expressed in an effort to assist a patient with whom he sympathized or to avoid doctor-patient tension is unsupported by the record. (Tr. 20). Dr. Lampman treated Gillette from June 1997 until approximately May 2001. Dr. Baker treated Gillette from the spring of 2000 until the fall of 2001. Both of these treating physicians came to the same conclusion regarding Gillette's lupus condition and her limited ability to work given her symptoms. The non-examining physician's reviewed Dr. Lampman's evaluations and came to the opposite conclusion.

■ It is important to note that the opinions of non-examining physicians ordi-narily do not constitute substantial evidence on the record as a whole. *Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002). The opinions of Dr. Baker and Dr. Lampman are far more detailed and informative than the cursory review given by the non-examining physicians. The brief, conclusory opinions of the non-examining physicians provide little substance and do not equate with "better or more thorough medical evidence." The opinions of Dr. Baker and Dr. Lampman were improperly disregarded and should have been afforded the special deference they were due as treating physicians of the claimant. An ALJ may credit other medical evaluations over that of a treating physician when such other assessments "are supported by better or more thorough medical evidence." *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir.1997). However, in this case, such evidence does not exist in the record.

## B. CLAIMANT'S TESTIMONY

■ The ALJ also concluded that Gillette's testimony concerning her activity level contradicted earlier written statements that she made during the application process. The record clearly reveals that the biggest challenges to Gillette being able to work are fatigue. (Tr. 70). Gillette's written responses to the daily activities questionnaire do not contradict her testimony.

In the activities questionnaire Gillette revealed that she goes to bed early, gets up early, and takes a nap every afternoon. (Tr. 163). Her family helps with housework and meal preparation. (Tr. 163–64). Her husband does the yardwork. (Tr. 164). For recreation Gillette does some gardening, plays bingo, and fishes if it is not hot or sunny. (Tr. 164). Sunlight and warm weather cause her to break out in a rash and cause fever, shortness of breath, headaches and fatigue. (Tr. 165). Gillette

likes to read but sometimes has trouble with her eyes and headaches that prevent her from reading. (Tr. 164). She also reported that soreness in her hands, back and shoulders make it difficult for her open containers and lift or carry items such as groceries bags. (Tr. 164). She is no longer able to go dancing. (Tr. 165). Her husband's answers to a pain questionnaire report similar problems and activity levels as do Gillette's responses to a personal pain questionnaire. (Tr. 147, 151).

The Eighth Circuit has consistently held that the ability to do some limited housework does not compel a finding of no disability. *Eback v. Chater*, 94 F.3d 410, 413 (8th Cir.1996); *Gude v. Sullivan*, 956 F.2d 791, 795 (8th Cir.1992); *see Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir.1995); *Harris v. Secretary of DHHS*, 959 F.2d 723, 726 (8th Cir.1992). Light housework does not comport with full-time competitive work. Further, it is not necessary for a claimant to show she is confined to a life in front of the TV to prove that she is disabled. *Baumgarten v. Chater*, 75 F.3d 366, 369 (8th Cir.1996).

At the administrative hearing, Gillette testified that she liked to read and watch TV. (Tr. 45). She is able to care for her own personal needs and her husband and daughter help her with the housework. (Tr. 45). She is able to sweep the floor but does not mop. (Tr. 46). Her husband does the yardwork. (Tr. 47). Gillette does not exercise. (Tr. 47). She reported going fishing once in the year prior to the hearing. (Tr. 47). She feeds and waters the dog but does not take it for walks. (Tr. 47–48). She does not go to the mall or church and only occasionally goes to the movies or to visit friends. (Tr. 48). She is no longer able to dance at pow wows but does go to watch. (Tr. 49). She is able to drive a car. (Tr. 50). These activities do not demonstrate the claimant's ability to work full-time in the competitive local or national economy. None of these activities support the conclusion that Gillette can perform full-time work in the competitive local or national economy.

The ALJ noted that this testimony was inconsistent with Gillette's written responses but no explanation was offered as to how such testimony was inconsistent. (Tr. 17). The Court finds no inconsistency. Gillette's statements are consistent with the nature of lupus in that in tends to flare up and then subside only to flare-up again. The pain and fatigue come and go. It is clear that a person with lupus has good days on which she can be fairly active and bad days when little, if anything, can be accomplished. The Court concludes that substantial evidence on the record as a whole *does not* support the Secretary's determination that Gillette is able to perform her past relevant work; that she has the residual functional capacity to work; and that she is not disabled. When considered in totality, Gillette's limitations and disabilities present a clear picture of a person who cannot hold down a full-time position.

## VI. ONSET DATE

■ Gillette has alleged an onset date of January 5, 1997. She filed her application on May 14, 2001. Dr. Baker gave an onset date of April 1998 which would coincide with Gillette being hospitalized for a flare-up of her lupus. (Tr. 455). Dr. Lampman has not rendered an opinion as to the onset of disability. However, his evaluation on May 11, 2001, clearly shows that Gillette was disabled as of that date. (Tr. 270). With a chronic, inflammatory disorder such as lupus it can be difficult to determine an onset date. Although Gillette may have been disabled prior to May 11, 2001, the record is conclusive as to that date. Justice is best served by an award of benefits from May 11, 2001.

## VII. CONCLUSION

For the reasons set forth above, the Court GRANTS Gillette's Motion for Summary Judgment (Docket No. 6) and DENIES the Commissioner's Motion for Summary Judgment (Docket No. 12). The decision of the Commissioner is reversed and the matter is remanded for an award of benefits from May 11, 2001.

IT IS SO ORDERED.